Opinion
 

 PHELAN, J.
 

 I. Introduction
 

 Appellant Robin Re Sharp timely appeals from his conviction after a jury trial of seven felony counts of forcible lewd and lascivious conduct with a child under the age of fourteen years (Pen. Code, § 288, subd. (b) [counts 3, and 5, relating to Joann G.; counts 20, 22, 24 and 26, relating to Tammy G.; count 44, relating to Vanessa P.]),
 
 [1]
 
 one felony count of forcible penetration with a foreign object (§ 289, subd. (a) [count 4, relating to Joann G.]), three felony counts of nonforcible lewd and lascivious conduct with a child under the age of fourteen years (§ 288, subd. (a) [counts 6 and 7, relating to Joann G.; count 43, relating to Vanessa P.]), two felony counts of rape (§ 261, subd. (a)(2) [counts 11 and 13, relating to Tammy G.]), three felony counts of forcible oral copulation with a person under the age of fourteen years (§ 288a, subd. (c) [counts 19, 21 and 23, relating to Tammy G.]), and one misdemeanor count of battery (§ 242 [count 9, relating to Joann G.]). Appellant was also convicted, based on a plea of no contest, to five counts of receiving stolen property (§ 496.1 [counts 33, 40, 42, 51 and 52]), eleven counts of residential burglary (§ 459 [counts 31, 32, 34, 35, 36, 37, 38, 39,
 
 *1777
 
 41, 47 and 48], one felony count of forcible lewd and lascivious conduct with a child under the age of fourteen years (§ 288, subd. (b) [count 49, relating to Rebecca F.]), and one felony count of attempted kidnapping (§§ 207, subd. (a), 664 [count 50, relating to Rebecca F.]).
 

 After a bench trial, the court found true the allegation of a prior conviction of a serious felony, first degree rape of a 12-year-old girl in the state of Washington. (§ 667, subd. (a).) The trial court sentenced appellant to a total of 129 years in state prison for the foregoing offenses.
 

 Appellant’s primary contention on appeal (and the sole issue presented in his petition for writ of habeas corpus) is that he was deprived of his constitutional right to face-to-face confrontation with his accuser when the prosecutor positioned herself in the courtroom so that one of the young victim witnesses, Tammy G., did not have to look at him while testifying about his acts of sexual molestation. Appellant also contends that the trial court erred in denying his request for a new attorney to investigate a possible new trial motion based on incompetence of trial counsel. In the published portion of this opinion, we hold that the procedure used by the prosecutor to question Tammy did not violate appellant’s confrontation clause rights, and that the trial court did not abuse its discretion by rejecting his posttrial claim of ineffective assistance.
 

 Appellant also claims that the trial court erred by admitting certain hearsay and similar act evidence, and by failing to inquire about an incident in which two jurors were reported to have cried after hearing the victim witnesses’ testimony. Finally, appellant contends that the evidence was insufficient to support the convictions on several of the sex offenses, and that the trial court erred in its computation of his sentence. We address all but one of these claims in the unpublished portion of the opinion. As to appellant’s claim that there was insufficient evidence of a “lewd or lascivious act” to support the conviction on count 6, we conclude in a published portion of the opinion that even a seemingly innocent act, such as stroking a child’s hair or rubbing her back, can be found to be “lewd or lascivious” when viewed in the totality of the circumstances in which it occurred.
 

 Finding no reversible error, we affirm the judgment of conviction in its entirety and deny the petition for writ of habeas corpus. However, we remand for resentencing to correct an error which, respondent concedes, was committed by the trial court in the determination of appellant’s sentence.
 

 II. Factual and Procedural Background
 

 Appellant’s claims of error all relate to his convictions, entered upon the jury’s verdict, of sex offenses against three young girls. Joann G. was nine or
 
 *1778
 
 ten years old when she lived on Heidi Place in Santa Rosa, where appellant was her neighbor from 1989 to 1992. Joann testified to four incidents of lewd and lascivious conduct.
 

 In the first incident, charged in counts 6 and 7, Joann and a friend were washing appellant’s truck when appellant told her he wanted to show her something in the backyard. Joann followed him, waited at the fence and, while she was there, appellant “dangled” her hair
 
 [2]
 
 and massaged her back. Appellant also reached down and around under her shirt and pinched her breast. Appellant told her, “[I]t’s okay, you don’t have to do nothing, just don’t tell your mom or nothing.” Joann said this made her afraid. Joann then returned to the truck. Appellant tried to touch her breast again, but she put her hand down to block him.
 

 On another occasion, charged in count 3, appellant rubbed Joann’s genital area hard enough so that it hurt. When Joann returned home, she started to bleed when she went to the bathroom. On yet another occasion, charged in count 4, appellant used his hand to pull down her shorts and panties and then put something “really greasy up [her] butt.” She did not know what it was and did not turn around to look because she was afraid. She said her rectum hurt that day and the next day. Trudy Crough, a physician’s assistant and the pediatric sexual abuse coordinator at the county hospital, examined Joann in February 1992 and found a tear in her anus in a position consistent with penetration while she was standing. Crough found no signs of trauma to Joann’s vagina.
 

 In the fourth incident, charged in counts 5 and 9, Joann saw appellant walking on the street looking disheveled, with his penis exposed. Appellant told her to approach him and then accused her of telling her mother about his prior conduct. He also made her touch his penis by holding her hand to it and, when she did, he slapped her. She then fell down and appellant tried to kick her. Earlier, appellant had told her he would kill or hurt her or her family if she told anyone.
 

 Appellant also sexually assaulted Joann’s younger sister, Tammy G., who was eight years old at the time of the incidents alleged in this case. Tammy initially testified that appellant never touched her, but that she was afraid of him. At that point, the prosecutor asked for a recess. After the break, the prosecutor moved to a position in the courtroom so Tammy would not have to look at appellant while testifying. Tammy then testified that appellant took her into his bedroom twice and touched her in the vaginal and anal
 
 *1779
 
 areas. She also said that, on one occasion, he took her clothes and his clothes off and lay on top of her but did not penetrate her. At that point, Tammy told the court she was tired and her testimony was continued to the next court day.
 

 When Tammy took the stand again two days later, she testified that appellant penetrated her vagina twice with his penis. On either that or another occasion, appellant penetrated her rectum with his hand. She further testified that he touched her rectum with his penis three or four times when she was in his bedroom, and put his mouth on her vagina three times. Appellant told her not to tell anyone or he would kill her mom.
 

 Trudy Crough also examined Tammy in February 1992 and found a tear in her hymen that she believed was caused by penetration. There was also, however, undisputed evidence that Tammy had been molested by a friend’s father between July 1990 and February 1992. During the examination by Crough, Tammy said that appellant molested her by, among other things, anal-penile and anal-finger contact.
 

 The jury also heard testimony from Carol Brandt, a special education teacher for the Santa Rosa School District who works with children with learning disabilities. Brandt described her work with both Tammy and Joann. As to Tammy, Brandt said she had disabilities in auditory memory, auditory perception, and language development. In her opinion, Tammy was able to remember events but sometimes had difficulty explaining them. When asked if Tammy was truthful, Brandt said, “I think so.” In 1989, Brandt also worked with Joann who, at the time, had an auditory attention deficiency and difficulty in focusing. According to Brandt, Joann’s memory seemed fine and she appeared to be truthful.
 

 Appellant molested a third neighborhood girl, Vanessa P., when she was eight or nine years old. Vanessa testified that appellant would occasionally pay her to wash his truck. One time, while Vanessa was washing the truck, appellant touched her breast. She tried to get away from appellant by moving to the other side of the truck, but he went around and tickled her on the breast again. Appellant said he was not going to hurt her. Vanessa further testified to another occasion on which appellant picked her up after she fell off a swing and held her for “[kjind of long” and “[a] little tight,” touching her knee with his penis.
 

 Appellant did not take the stand in his own defense. In fact, the only defense witness to testify was Dr. Kevin Coulter, a pediatrician, who reviewed the slides of the anal and vaginal areas of Joann and Tammy G. taken
 
 *1780
 
 in February 1992. Dr. Coulter testified that he did not find any abnormalities, but admitted that there have been studies showing that known penetrations do not necessarily lead to abnormal findings.
 

 The jury trial in this case began on July 27, 1992. On July 31, appellant pleaded no contest to counts 31 through 42, and 47 through 52 of the 52-count information, as described above. On September 3, the court granted appellant’s motion for acquittal on eleven of the remaining counts. On September 4, the jury rendered its verdict. On the same date, the court dismissed five additional counts that were charged as alternatives or as lesser counts of crimes for which he was convicted. The court also dismissed one count of burglary “in the interest of justice.” On September 10, the court found true the allegation of a prior conviction of a serious felony.
 

 On October 29, appellant moved through counsel to withdraw his no contest pleas. On November 2, he also moved for a new trial based on newly discovered evidence. Both appellant and his trial counsel filed briefs in support of the new trial motion. On November 12, the court denied both motions. Thereafter, appellant moved in pro per seeking appointment of substitute counsel because of alleged ineffective assistance of his trial attorney. After a hearing in chambers with appellant and his trial counsel, the court denied this motion on November 30. Appellant was sentenced on December 1, 1992. This timely appeal followed.
 

 III. Discussion
 

 A.
 
 The Prosecutor’s Questioning of One of the Young Victim Witnesses, With the Child Looking Away From the Defense Table, Did Not Deprive Appellant of His Right to Face-to-face Confrontation.
 

 Appellant’s first contention is that he was deprived of his right to face-to-face confrontation with his accuser (U.S. Const., Amend. VI; Cal. Const., art. I, § 15) when the prosecutor sat or stood next to the witness stand so Tammy could look away from the defense table while she was testifying. Tammy was the victim in nine of the seventeen counts of which appellant was convicted by the jury, and much of the testimony given in this unorthodox fashion was central to the prosecution’s case on the counts involving Tammy.
 

 Appellant relies primarily on
 
 Herbert
 
 v.
 
 Superior Court
 
 (1981) 117 Cal.App.3d 661 [172 Cal.Rptr. 850, 19 A.L.R.4th 1276]
 
 (Herbert),
 
 a prosecution for oral copulation and lewd acts upon a child, in which the defendant claimed his confrontation rights were violated by an arrangement by which
 
 *1781
 
 the young victim witness was seated so the defendant could hear but not see her as she testified at the preliminary examination. Apparently, the magistrate in that case sat in the jury box facing the child, who was seated in the witness chair, but the defendant was seated across the courtroom from the magistrate such that his view of the witness stand was obstructed by the bench.
 
 {Id.
 
 at pp. 664-665, fn. 1.) The magistrate had ordered this unusual arrangement after finding that the child was reluctant or unable to testify because she “ ‘was disturbed by the number of people in the courtroom and in particular with the presence of the defendant. .
 
 {Id.
 
 at p. 664.)
 

 The Third District held that the arrangement violated the defendant’s confrontation rights: “By allowing the child to testify against defendant without having to look at him or be looked at by him, the trial court not only denied defendant the right of confrontation but also foreclosed an effective method for determining veracity.”
 
 {Herbert, supra,
 
 117 Cal.App.3d at p. 668.) As the court explained, “The historical concept of the right of confrontation has included the right to see one’s accusers face-to-face, thereby giving the fact-finder the opportunity of weighing the demeanor of the accused when forced to make his or her accusation before the one person who knows if the witness is truthful.”
 
 {Id.
 
 at p. 671.)
 

 Herbert
 
 is distinguishable from the instant case. In that case, the courtroom was arranged so it was physically impossible for the defendant and witness to see one another during the child’s testimony.
 
 [3]
 
 (117 Cal.App.3d at pp. 664-665, fn. 1.) Here, by contrast, appellant was able to watch Tammy as she gave sworn testimony, limited only in his view of a portion of her face. Evidence presented in connection with appellant’s habeas petition indicates that appellant was able to see the side and back of Tammy’s head during the prosecutor’s examination. Thus, even if he could not clearly see all of her facial expressions, appellant could observe the witness’s general demeanor and reactions to the questioning. Tammy, on the other hand, was able but
 
 *1782
 
 chose not to look at appellant. The relevant fact finder—the jury—was able to view both the defendant and Tammy, and their reactions to one another and the questioning, during the child’s testimony. We find nothing improper about this procedure.
 

 Indeed, the situation in this case is not materially different from one in which a witness might stare at the floor, or turn her head away from the defendant while testifying. In such a case, “[t]he Confrontation Clause does not, of course, compel the witness to fix his eyes upon the defendant; [the witness] may studiously look elsewhere.”
 
 (Coy
 
 v.
 
 Iowa, supra,
 
 487 U.S. at p. 1019 [101 L.Ed.2d at p. 866].) The mere fact that the prosecutor facilitated Tammy’s decision to look away from appellant does not transform this innocuous act into a violation of the confrontation clause.
 

 A contrary holding would border on the absurd. Surely, appellant cannot be claiming a constitutional right to stare down or otherwise subtly intimidate a young child who would dare to testify against him. Nor can he claim a right to a particular seating arrangement in the courtroom. A witness who avoids the gaze of the defendant may be exhibiting fear, embarrassment, shyness, nervousness, indifference, mendacity, evasiveness, or a variety of other emotional states or character traits, some or all of which might bear on the witness’s credibility. It is, however, the function of the jury to assess such demeanor evidence and “draw its own conclusions” about the credibility of the witness and her testimony.
 
 (Coy
 
 v.
 
 Iowa, supra,
 
 487 U.S. at p. 1019 [101 L.Ed.2d at p. 866].) There was no interference with the jury’s ability to perform that function in this case.
 

 Although we decline to follow
 
 Herbert
 
 on the ground that it is distinguishable, we also have serious doubts about the precedential value of that case.
 
 Herbert
 
 appears to hold that a criminal defendant has an absolute right—under the confrontation clause of both the federal and state Constitutions (U.S. Const., Amend. VI; Cal. Const., art. I, § 15)—to see and be seen by his accusers during any testimony, regardless of the age of the witness, the type of crimes charged, and the potential for further psychological trauma to the particular child from having to testify under the hostile glare of the defendant.
 
 Herbert
 
 has been criticized by the California Supreme Court because of its assumption that the state and federal Constitutions require such a result in a preliminary hearing.
 
 (Whitman
 
 v.
 
 Superior Court
 
 (1991) 54 Cal.3d 1063, 1077 [2 Cal.Rptr.2d 160, 820 P.2d 262].) The holding of
 
 Herbert
 
 has also been limited by statutes which were enacted by the California Legislature to provide special protection to young children who are called to testify as victims of sexual molestation. (§ 1346 et seq.)
 

 Since
 
 Herbert
 
 was decided, moreover, the United States Supreme Court has held that a trial court may employ procedures allowing something
 
 *1783
 
 less than literal face-to-face confrontation between an adult defendant and his or her child victims in a sexual molestation prosecution.
 
 (Maryland
 
 v.
 
 Craig, supra,
 
 497 U.S. at pp. 849-850 [111 L.Ed.2d at pp. 680-681].) Such procedures will pass constitutional muster if: (1) they are necessary in a given case to protect a child witness from emotional trauma that would be caused by testifying in front of the defendant, at least where such trauma would impair the child’s ability to communicate; and (2) the reliability of the testimony is otherwise assured by rigorous adversarial testing.
 
 (Id.
 
 at pp. 850, 857 [111 L.Ed.2d at pp. 681, 686].)
 

 Under the two-part test established by
 
 Maryland
 
 v.
 
 Craig, supra,
 
 we conclude that the procedure approved by the trial court in this case did not violate appellant’s confrontation clause rights. We first note that the arrangement of the courtroom during Tammy’s testimony resulted in only the most minimal interference with appellant’s right to confront his accuser. Tammy and the other accusing witnesses physically appeared in open court to give live testimony against appellant before judge and jury. They testified under oath and were subject to contemporaneous cross-examination. No physical barrier or screen was erected between appellant and the witnesses as they testified. No technological devices were employed to insulate the witnesses from the accused. (Cf. 497 U.S. at pp. 849-850 [111 L.Ed.2d at pp. 680-681].) Indeed, the only limitation on appellant’s right to confront Tammy was that he did not have a full, frontal view of her face.
 

 Balanced against appellant’s interest in having a literal face-to-face meeting with Tammy were the important interests of the state in obtaining a complete and accurate account of the interactions between appellant and Tammy, and in protecting Tammy from unnecessary emotional trauma.
 
 (Maryland
 
 v.
 
 Craig, supra,
 
 497 U.S. at pp. 845-846, 852-853 [111 L.Ed.2d at pp. 678-679, 682-683].) Although the trial court did not make explicit findings, it is apparent from the record of her testimony that Tammy was experiencing considerable distress and suffering inexplicable memory lapses about sex acts she had theretofore consistently reported.
 
 [4]
 
 It also appears that Tammy was having difficulty focusing, as the prosecutor repeatedly had to ask her to “[l]ook at me [the prosecutor]” while she was testifying.
 
 [5]
 
 She was, in short, unable to participate effectively in the proceedings when seated in the conventional position in the witness box, facing appellant.
 

 
 *1784
 
 When the prosecutor began her direct examination on the morning of August 11, Tammy initially testified that appellant never touched her anywhere. Tammy then gave a series of flatly contradictory answers to the prosecutor’s questions. For example, she answered “Yeah,” when the prosecutor asked, “Did anything happen when you were in Robin’s house?” Immediately thereafter, however, she answered “No,” when the prosecutor asked if Robin said or did anything to her when she was in his house. Obviously concerned that Tammy was becoming aphonic, the prosecutor asked Tammy if she was scared. At first, Tammy would only nod her head but, eventually, she testified that she was scared of appellant “in particular.” Tammy then testified she told a detective that appellant asked her if she wanted to play a game. Tammy answered “Yeah” when the prosecutor asked if she remembered what happened next. But when the prosecutor asked if she could tell the jury what happened, she said, “I forgot.” The balance of Tammy’s testimony on the morning of August 11 is riddled with inconsistency, forgetfulness, evasiveness, and confusion.
 

 After a two-hour recess, the prosecutor obtained the court’s permission to continue her examination of Tammy from a chair to the right of the witness stand, so the child would not have to look at appellant. At that time, the prosecutor argued that “I think that it was clear to all present that when Tammy was testifying earlier today she was scared and was unable to participate.” The prosecutor conducted the rest of her examination of Tammy with the child facing away from the defense table. It was during her testimony on the afternoon of August 11, and on the following court day, that Tammy described the numerous sex acts for which appellant was convicted.
 

 After a careful review of the record, we are persuaded that the minor interference with appellant’s right to face-to-face confrontation was fully justified in the circumstances of this case. Allowing Tammy to look away from the defense table while giving live, in-court testimony, maximized appellant’s opportunity to have a face-to-face meeting with a key prosecution witness, while minimizing the resulting emotional trauma to the young witness. It also afforded the jury an opportunity to hear and see a full account of Tammy’s claims, ranging from complete denial to detailed descriptions of multiple acts of sexual molestation. The jury was as free to decide that Tammy was being truthful when she said appellant never touched her, as it was to accept her graphic testimony about acts of sexual intercourse, oral copulation, penetration with a foreign object, and sodomy. There
 
 *1785
 
 was no error in the trial court’s decision to authorize this procedure, which clearly “preserve[d] the essence of effective confrontation.”
 
 (Maryland
 
 v.
 
 Craig, supra,
 
 497 U.S. at p. 857 [111 L.Ed.2d at p. 686].)
 

 Two recent cases from other jurisdictions are in accord with our conclusion.
 
 (Brandon
 
 v.
 
 State
 
 (Alaska App. 1992) 839 P.2d 400;
 
 Stanger
 
 v.
 
 State
 
 (Ind.Ct.App. 1989) 545 N.E.2d 1105.) In
 
 Stanger,
 
 the court considered whether placement of a witness chair at a slight angle toward the jury and away from the accused during the testimony of the child witnesses violated the defendant’s confrontation rights. (545 N.E.2d at p. 1112.) The procedure utilized did not prevent the defendant from hearing or seeing the child witnesses. It did not prevent the witnesses from being heard or seen by the judge or jury. Nor did it prevent the witnesses from hearing or seeing the defendant. The defendant’s only objection was that the witnesses were not facing directly at him.
 
 (Ibid.)
 
 The Indiana Court of Appeals held that the arrangement did not violate the defendant’s right of confrontation, as guaranteed by either the federal or state constitution: “Where, as here, the method of eliciting testimony permits jury, witness, and defendant all to see and hear each other and possesses the added virtue of actually facilitating the truthfinding function at the trial, positioning the witness away from the defendant is but a reasonable limitation on the defendant’s interest in physical confrontation.”
 
 (Id.
 
 at p. 1113, fn. omitted.)
 

 Brandon
 
 v.
 
 State, supra,
 
 involved a defendant accused of beating his wife nearly to death while his three-year-old son watched. (839 P.2d at p. 402.) The defendant in that case claimed he was deprived of his confrontation clause rights when the trial court arranged for the son to testify from a small chair and table, rather than from the witness stand. This arrangement placed the boy’s chair perpendicular to his father, in a position from which he could probably see his father out of the comer of his eye.
 
 (Id.
 
 at p. 409.) Evidence presented by the prosecutor indicated that the boy was “ ‘particularly afraid of testifying against his father, knowing his father will be here in the court.’ ”
 
 (Ibid.)
 
 The Alaska Court of Appeals held that the defendant’s right of confrontation was not infringed.
 
 (Id.
 
 at p. 410.) The court based its holding on the facts that the child’s position relative to his father was “ ‘not really different from where their positions would be if he were in the regular witness chair,’ ” and that the trial judge did not require defense counsel to question the child from any particular part of the courtroom. Thus, if defense counsel had questioned the child from the podium or the normal defense counsel’s chair, the child would have had to face the defendant in order to respond directly to counsel.
 
 (Ibid.)
 

 As did the courts in the foregoing cases, we recognize that trial courts are regularly called upon to make tough decisions about how to afford criminal
 
 *1786
 
 defendants the full measure of procedural protections to which they are entitled under the confrontation clause, without unduly traumatizing victim witnesses whose contributions to the truth-seeking process are so vital. When the victim witness is a young child, the risks of damage to both the witness and the truth-seeking function can be especially great. (See
 
 Maryland
 
 v.
 
 Craig, supra,
 
 497 U.S. at p. 857 [111 L.Ed.2d at p. 686]; and see generally, Cecchettini-Whaley,
 
 Children as Witnesses After Maryland
 
 v.
 
 Craig
 
 (1992) 65 So.Cal.L.Rev. 1993, 2005-2018.) The special procedure approved by the trial court in this case minimized those risks, while maximizing appellant’s opportunity for a face-to-face meeting with his principal accuser. This procedure did not violate the confrontation clause.
 

 B., C
 
 *
 

 D.
 
 The Trial Court Did Not Abuse Its Discretion in Denying Appointment of Substitute Counsel for the Purpose of Investigating a Claim of Incompetence of Trial Counsel and a Second New Trial Motion.
 

 Appellant next contends that the trial court failed to adequately inquire into his posttrial claim that his counsel was incompetent, and his concomitant request for substitute counsel. (See
 
 People
 
 v.
 
 Marsden
 
 (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44];
 
 People
 
 v.
 
 Stewart
 
 (1985) 171 Cal.App.3d 388 [217 Cal.Rptr. 306].) We conclude that the trial court’s denial of appellant’s
 
 Marsden!Stewart
 
 motion was adequately informed, and well within its discretion in that appellant did not there—and does not here—make a proper showing of ineffective assistance by his appointed counsel.
 

 The decision whether to permit a defendant to discharge his appointed counsel and substitute another attorney is a matter entrusted to the sound discretion of the trial court.
 
 (People
 
 v.
 
 Marsden, supra,
 
 2 Cal.3d at p. 123.) “When a defendant moves for substitution of appointed counsel, the court must consider any specific examples of counsel’s inadequate representation that the defendant wishes to enumerate. Thereafter, substitution is a matter of judicial discretion. Denial of the motion is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would ‘substantially impair’ the defendant’s right to assistance of counsel.”
 
 (People
 
 v.
 
 Webster
 
 (1991) 54 Cal.3d 411, 435 [285 Cal.Rptr. 31, 814 P.2d 1273];
 
 People
 
 v.
 
 Marsden, supra,
 
 2 Cal.3d at pp. 123-125 [trial court must give defendant an opportunity to explain the
 
 *1787
 
 reasons for desiring new counsel].) “[T]he inquiry is forward-looking in the sense that counsel would be substituted in order to provide effective assistance in the
 
 future.
 
 But the decision must always be based on what has happened in the
 
 past.” {People
 
 v.
 
 Smith
 
 (1993) 6 Cal.4th 684, 695 [25 Cal.Rptr.2d 122, 863 P.2d 192], italics in original.) “If the claim is based upon acts or omissions that occurred at trial or the effect of which may be evaluated by what occurred at trial the court may rule on the motion for new trial without substituting new counsel.”
 
 {People
 
 v.
 
 Stewart, supra,
 
 171 Cal.App.3d at pp. 396-397.) The same standard of proof applies to a motion for substitute counsel made in the trial court whether it is made before or after conviction.
 
 {People
 
 v.
 
 Smith, supra,
 
 6 Cal.4th at p. 696.)
 

 Appellant’s claim of ineffective assistance was presented to the trial court in a
 
 Marsden
 
 motion filed by appellant in propria persona, literally on the eve of sentencing. In that motion, appellant argued that his court-appointed attorney, Barry Collins, had failed to investigate and subpoena a favorable defense witness—Vanessa’s grandmother, Beatrice Helmick—and to prepare a motion to suppress evidence obtained through illegal searches of his home and vehicles. Evidence obtained in those searches included a box containing numerous photographs and negatives that had been shot surreptitiously or stolen from the homes of young girls in the Santa Rosa area, distinctive articles of clothing that, had been described by victims as having been worn by a burglar who had been prowling the same area, and a handwritten note containing Tammy’s phone number.
 

 In response to appellant’s
 
 Marsden
 
 motion, the trial court conducted an evidentiary hearing at which appellant was afforded a full and fair opportunity to air his grievances against his trial counsel. Mr. Collins also testified briefly, informing the court that he had been aware of and considered each of the questions raised by appellant. Mr. Collins also said he believed he had at all times acted in appellant’s best interests but declined to comment further, saying that he did not want to do anything that might affect appellant’s appeal. At the conclusion of the hearing, the court denied the motion, stating that the matters raised therein had already been considered and rejected by the court, or should be raised on appeal. The court also commented that Mr. Collins had “done an admirable job,” and noted that the relationship between appellant and Mr. Collins was still functional: “This is not a situation where there’s been a breakdown in communication or such a strain between you that you could no longer effectively operate as a defense team.” The court further noted—and appellant agreed—that Mr. Collins was in a better position to represent appellant at sentencing than would be any newly appointed attorney.
 

 The court’s inquiry into appellant’s
 
 Marsden
 
 motion was adequate. It considered the specific examples of counsel’s inadequate representation that
 
 *1788
 
 appellant enumerated, all of which were based upon acts or omissions which occurred at trial or the effect of which could be evaluated by what occurred at trial. Thus, the trial court was fully justified in ruling on the motion for new trial without substituting new counsel.
 
 (People
 
 v.
 
 Webster, supra,
 
 54 Cal.3d at pp. 435-436;
 
 People
 
 v.
 
 Stewart, supra,
 
 171 Cal.App.3d at pp. 396-397.)
 

 As to Ms. Helmick, the trial court was fully apprised of the fact that she had been available to testify for the defense at trial but had not been called. This information was presented to the court both in the opposition to appellant’s motion for a new trial and in the
 
 Marsden
 
 proceeding. In addition, the court had before it an offer of proof as to what she would say if called as a witness. There was no error in the trial court’s finding that her testimony had only minimal probative value and would not have made any difference in the outcome of the trial. Indeed, even if fully credited, Ms. Helmick’s proposed testimony—that she did not see appellant molest her granddaughter or any other young girl—would have added almost nothing to the defense case. Several other neighbors had already testified that they were in a position to, but never did, see appellant sexually molest the girls who spent time at his house. Reasonable defense counsel could also conclude that calling Ms. Helmick to, in essence, accuse her own granddaughter of lying about appellant’s acts of molestation would be more harmful than helpful to his client’s cause. We see no reason to disturb the trial court’s findings with respect to this claim of ineffective assistance of counsel.
 

 The trial court was also fully apprised of the circumstances of each of the searches that yielded evidence against appellant, having before it sworn testimony about them during the preliminary hearing. The court was also familiar with the applicable case law. There is no dispute that appellant was at all relevant times a parolee, subject to warrantless searches. Such searches are lawful if based on a reasonable suspicion that the parolee is involved in criminal activity or otherwise violating the terms of his parole.
 
 {People
 
 v.
 
 Johnson
 
 (1988) 47 Cal.3d 576, 594 [253 Cal.Rptr. 710, 764 P.2d 1087];
 
 People
 
 v.
 
 Burgener, supra,
 
 41 Cal.3d at pp. 533-536.) There was not and, we think, cannot be any serious question but that the searches were conducted upon reasonable suspicion. Further, although appellant correctly notes that parolees retain the right to object to searches conducted in an unreasonable manner (see
 
 People
 
 v.
 
 Bravo
 
 (1987) 43 Cal.3d 600, 607 [238 Cal.Rptr. 282, 738 P.2d 336]), or undertaken for purposes of harassment
 
 {People
 
 v.
 
 Clower
 
 (1993) 16 Cal.App.4th 1737, 1741-1742 [21 Cal.Rptr.2d 38]), the record of this case is utterly devoid of any indication that the searches of appellant’s residence, car, and work vehicle were improper in either motive or manner of execution. No other plausible basis for challenging the searches appears in the record, or in appellant’s briefs.
 

 
 *1789
 
 It is true that, as a “layman totally unschooled in the law,” appellant could not be expected to conduct an investigation and determine whether a motion to suppress the seized items would have been meritorious. It is also true, however, that appellant was not left entirely to his own devices to deal with this issue. As we have discussed, the trial court was familiar with the case law governing parole searches and the circumstances of the searches conducted in this case. Appellant has also had the benefit of an independent review of this matter by his court-appointed appellate/habeas counsel. That review has yielded no new facts or case authority to warrant further inquiry into the competence of trial counsel in his handling of the search and seizure question. It would be pointless to remand to the trial court for further proceedings on this issue.
 
 [6]
 

 E., F.
 
 *
 

 G.
 
 There Was Sufficient Evidence to Support the Convictions on All the Sex Offenses.
 

 Appellant next contends that there was insufficient evidence to support the convictions on several of the sex offenses in this case. We will discuss each of his contentions in turn.
 

 1.
 
 Count 6.
 

 First, he argues that there was no “lewd or lascivious act” proven as the predicate for count 6. (§ 288, subd. (a).) As framed for the jury by the prosecutor during closing argument, that count consisted of appellant’s conduct in “dangling” Joann’s hair while she was standing by his fence— after having been lured there by appellant on the pretense that he wanted to show her something in the backyard—followed by the rubbing of her back. At that time, appellant told her, “[Ijt’s okay, you don’t have to do nothing, just don’t tell your mom or nothing.” The prosecutor argued that, while the particular acts charged in count 6 “may seem somewhat innocent," it could
 
 *1790
 
 be inferred from the circumstances that the acts were “lewd and lascivious” and that appellant had the specific intent to arouse himself or Joann. Among the circumstances the prosecutor asked the jury to consider were appellant’s other, more obviously sexual contacts with Joann, as well as with Tammy and Vanessa.
 

 The issue here is whether appellant’s conduct in “dangling” Joann’s hair and rubbing her back can constitute a “lewd or lascivious act” within the meaning of section 288.
 
 [7]
 
 Appellant argues as a matter of law that it cannot, citing a line of cases which hold that an “innocuous or innocent touching,” even one performed with the requisite intent, is insufficient to constitute a violation of section 288.
 
 (People
 
 v.
 
 Wallace
 
 (1992) 11 Cal.App.4th 568, 571 [14 Cal.Rptr.2d 67];
 
 People
 
 v.
 
 Webb
 
 (1958) 158 Cal.App.2d 537, 542 [323 P.2d 141]; see also
 
 People
 
 v.
 
 Gaglione
 
 (1994) 26 Cal.4th 1291, 1297-1298 [32 Cal.Rptr.2d 169];
 
 People
 
 v.
 
 Filson
 
 (1994) 22 Cal.App.4th 1841, 1852 [28 Cal.Rptr.2d 335];
 
 People
 
 v.
 
 Self (1993) 12
 
 Cal.App.4th 1222, 1226-1227 [16 Cal.Rptr.2d 67].) Under this line of cases, “[a] lewd or lascivious act is defined as any touching of the body of a child which to an
 
 objectively reasonable person
 
 is sexually indecent or tends to arouse sexual desire. [Citation.] In sum, it is a sexual act.”
 
 (People
 
 v. Wallace,
 
 supra, 11
 
 Cal.App.4th at p. 579, italics in original; and see
 
 People
 
 v.
 
 Webb, supra,
 
 158 Cal.App.2d at p. 542 [defining a lewd or lascivious act as “an act which is lustful, immoral, seductive or degrading”].)
 
 [8]
 
 As the
 
 Wallace
 
 court explained, “[A] mere intention of the accused to commit a crime or his belief that he is committing a crime, does not give rise to criminal liability. Apart from the mens rea, there must be some act or conduct in violation of law which itself is socially harmful.” (11 Cal.App.4th at pp. 579-580.)
 

 Respondent urges us to follow another line of cases which hold that
 
 any touching
 
 done with the requisite intent can be a “lewd or lascivious
 
 *1791
 
 act” within the meaning of section 288.
 
 (People
 
 v.
 
 Marquez
 
 (1994) 28 Cal.App.4th 1315, 1325-1326 [33 Cal.Rptr.2d 821];
 
 People
 
 v.
 
 Gilbert
 
 (1992) 5 Cal.App.4th 1372, 1380 [7 Cal.Rptr.2d 660] [rubbing stomach, back and thigh sufficient to constitute lewd or lascivious act when done with requisite intent as established by course-of-conduct evidence];
 
 People
 
 v.
 
 Dontanville, supra,
 
 10 Cal.App.3d at pp. 795-796 [rubbing victim’s stomach, with requisite intent, can be a lewd or lascivious act];
 
 People
 
 v.
 
 Hobbs
 
 (1952) 109 Cal.App.2d 189, 190-192 [240 P.2d 411] [kissing and rubbing the leg of a 12-year-old girl under her skirt was lewd or lascivious act within the meaning of section 288]; see also
 
 People
 
 v.
 
 Austin, supra,
 
 111 Cal.App.3d at p. 113;
 
 People
 
 v.
 
 Pitts, supra,
 
 223 Cal.App.3d at pp. 887-889.) As the
 
 Hobbs
 
 court explained, “Section 288 of the Penal Code was enacted to protect children from the lustful advances and tamperings of callous and unscrupulous persons as well as from the assaults of depraved unfortunates. In all cases arising under this statute the purpose of the perpetrator in touching the child is the controlling factor and each case is to be examined in the light of the intent with which the act was done. In
 
 People
 
 v.
 
 Owen
 
 [(1945)] 68 Cal.App.2d 617, 620. . . , it is said that ‘It is not the accomplishment but the intent of the party that is the basis of the commission of the acts condemned in Penal Code section 288.’ If intent of the act, although it may have the outward appearance of innocence, is to arouse, or appeal to, or gratify the lust, the passion or the sexual desire of the
 
 perpetrator
 
 it stands condemned by the statute, or, if it is intended to arouse feelings of passion or sexual desire in the
 
 child,
 
 it likewise stands condemned. The intent with which the act is done is manifested by the circumstances under which it was committed. (§ 21.) As is said in
 
 People
 
 v.
 
 Owen, supra,
 
 each case involving a lustful advance upon a child ‘must be decided by the evidence introduced and is not necessarily controlled by a previous decision.’ ”
 
 (People
 
 v.
 
 Hobbs, supra,
 
 109 Cal.App.2d at p. 192, italics in original.)
 

 We find the circumstances of this case to be sufficient under either of these two lines of authority. The instant case presents a good example of seemingly “innocent” acts—stroking a child’s hair and rubbing her back— that take on a markedly sexual cast when viewed in context. There was ample evidence from which an objectively reasonable person could conclude that these acts, committed after appellant lured Joann to a secluded spot on a pretense and reassured her of her safety but instructed her “not to tell,” were “sexual” in nature even under the definition stated in
 
 People
 
 v.
 
 Wallace, supra,
 
 11 Cal.App.4th at page 579. This is perforce true given the evidence of other acts of a similar nature committed by appellant on the other young female victims in this case.
 
 (People
 
 v.
 
 Gilbert, supra,
 
 5 Cal.App.4th at pp. 1380-1381.) In addition, the jury could readily find that appellant’s conduct was not merely “preparatory” to some “ultimate” lewd
 
 *1792
 
 or lascivious act. (Cf.
 
 People
 
 v.
 
 Webb, supra,
 
 158 Cal.App.2d at p. 542.) Unlike the defendant in
 
 People
 
 v.
 
 Webb,
 
 who placed his arm around the shoulder of a young boy to lead him into a bungalow to molest him, appellant began to fondle Joann’s hair and back after they arrived at the location he had selected for the molestation. Finally, only a very calloused individual would fail to recognize that, even if appellant had stopped—or had been interrupted—on that particular occasion after rubbing Joann’s back, his conduct as charged in count 6 was itself “socially harmful” and “sexual” in nature
 
 when viewed in context. (People
 
 v.
 
 Wallace, supra,
 
 11 Cal.App.4th at p. 580.) It is likely that, by that point, he had already inspired the fear Joann said she experienced and violated the social compact by which adults are expected to care for, protect, and nurture children, and not to manipulate them as objects to satisfy the adult’s sexual urges. In the totality of the circumstances in which the alleged touchings occurred, we conclude that there was sufficient evidence from which a rational trier of fact could conclude beyond a reasonable doubt that appellant committed a “lewd or lascivious act” within the meaning of section 288, subdivision (a), when he “dangled” Joann’s hair and rubbed her back.
 

 Although we apply the “objectively reasonable person” test announced in
 
 People
 
 v.
 
 Wallace, supra,
 
 11 Cal.App.4th at page 579, we do not thereby, endorse the requirement that a “lewd or lascivious act” must be a “sexual act.” We note that concept has been incorporated in the Comment to revised CALJIC Instruction No. 10.41 (“The Wallace court require[s] that the act be
 
 by itself
 
 lewd.” (Italics added.)). We do agree with
 
 Wallace
 
 that a “lewd or lascivious act,” and the specific “intent of arousing, appealing to, or gratifying the lust or passions or sexual desires,” are separate elements which must be proven—and which must coincide (§ 20)—to establish a violation of section 288. (11 Cal.App.4th at pp. 578-579.) Furthermore, we share the concern that the
 
 pTt-Wcdlace
 
 CALJIC definition of a “lewd or lascivious act” can be read as conflating these two elements. (See
 
 id.
 
 at p. 581.) We are troubled, however, by the
 
 Wallace
 
 court’s attempt to limit the reach of section 288 to only those touchings which an “objectively reasonable person” would find to be “sexual” in nature.
 
 (People
 
 v.
 
 Wallace, supra,
 
 11 Cal.App.4th at pp. 579-580.)
 
 [9]
 
 Apparently, the
 
 Wallace
 
 court believed that there are some types of touchings which are inherently—and incontestably— “innocuous or innocent” and, thus, incapable of serving as the predicate for a section 288 violation. (11 Cal.App.4th at pp. 571, 578.) For example, the
 
 Wallace
 
 court strongly suggests that “innocuous” acts such as “brushing a child’s hair or touching a child’s arm” could never qualify as “lewd or lascivious acts,” regardless of the surrounding circumstances and even if
 
 *1793
 
 done with the requisite intent.
 
 (Id.
 
 at pp. 575-576, 580.) Similarly, the
 
 Wallace
 
 court sharply criticizes dicta in
 
 People
 
 v.
 
 Austin, supra,
 
 111 Cal.App.3d at pages 113-114, which suggested that a violation of section 288 was complete when a knife-wielding defendant offered to pay a child to pull down her pants and then, when the child was indecisive, touched her in the course of pushing and guiding her to a secluded spot in an orange grove. (11 Cal.App.4th at pp. 575-577.) The
 
 Wallace
 
 court also implies that nothing “sexual” or “socially harmful” was done to the 11-year-old victim in
 
 People
 
 v.
 
 Webb, supra,
 
 158 Cal.App.2d at page 542, by the time the defendant—a janitor who befriended the child over the course of the summer while working at a public school adjacent to the boy’s home—lured the boy onto the school grounds on the pretense he had a job for him, told the boy’s friend to remain outside the locked gates to the school, and placed his arm around the boy’s shoulder as he led the child to a bungalow (where he subsequently forced the child to perform an act of oral copulation that formed the basis of a separate count under section 288a). (11 Cal.App.4th at pp. 576-577.)
 

 We reject the
 
 Wallace
 
 court’s narrow view of what constitutes a “sexual” and “socially harmful” touching of a child. The 11-year-old victim in
 
 People
 
 v.
 
 Webb, supra,
 
 may well have been terrified when the defendant isolated him away from his friends and began to touch him by placing an arm around his shoulder. The same was undoubtedly true of the eight-year-old girl in
 
 People
 
 v.
 
 Austin, supra,
 
 111 Cal.App.3d at pages 112-114, as she was being shoved at knife point toward an isolated location for the purpose of completing the proposed molestation. Likewise, in this case, Joann testified that appellant’s acts of touching at his back fence were alarming to her.
 

 The five-year-old girl in
 
 People
 
 v.
 
 Gaglione, supra,
 
 may not have been sophisticated enough to be afraid of the stranger who lured her into a utility closet in her apartment complex with a promise of payment, then initiated physical contact by asking her first to touch him on the shoulder, then on his genitals. (26 Cal.App.4th at pp. 1295, 1298.) Like the young victims in
 
 Webb, Austin,
 
 and the instant case, however, the girl’s personal security and bodily privacy were clearly compromised as of the first touching. Nevertheless, if the child’s babysitter had interrupted the defendant after this first contact, rather than seconds later as she did,
 
 Wallace
 
 would require dismissal of the section 288 charge. (See
 
 People
 
 v.
 
 Gaglione, supra, 26
 
 Cal.App.4th at p. 1295.)
 
 [10]
 

 We think it beyond purview that social harm is done when an adult draws a child into his or her confidence, lures the child to an isolated location, acts
 
 *1794
 
 surreptitiously, and commences touching the child in a manner that invades the child’s bodily privacy and, at least in most instances, causes the child to be fearful.
 
 [11]
 
 As the foregoing discussion reveals, many such incidents—at least at the outset—involve acts that are not obviously “sexually indecent,” and would not “tend[] to arouse sexual desire” in a normal, objectively reasonable person. (Cf.
 
 People
 
 v.
 
 Wallace, supra,
 
 11 Cal.App.4th at p. 579.) When committed in an isolated location and accompanied by secretive conduct, however, the sexual nature of even the most ostensibly “innocuous” touching of a young child by an adult becomes apparent. Section 288 should not be read in such a restrictive fashion that there can be no criminal sanction until the defendant has accomplished a blatantly “sexual” act, or in cases where the transaction is interrupted or the child escapes before the “touching” has progressed to the point that the “sexual” nature of the act is evident without reference to the context in which it occurred.
 

 Accordingly, we hold that
 
 any touching
 
 of any part of the body of a child under the age of 14 can be “a lewd or lascivious act” within the meaning of section 288
 
 if, in the totality of the circumstances in which it occurred,
 
 including any secretive or predatory conduct by the defendant, a reasonable person could conclude it was sexual in nature. We further conclude that the instructions given in this case (CALJIC Nos. 10.41, 3.31, 2.02 (5th ed. 1988)), coupled with the prosecutor’s argument that the seemingly “innocent” acts alleged in count 6 were “lewd and lascivious” when viewed in the circumstances in which they occurred, were in substantial conformity with our holding and were sufficient to advise the jury of each of the elements
 
 *1795
 
 which the prosecution must prove, beyond a reasonable doubt, to establish a violation of section 288.
 
 [12]
 

 Of course, inadvertent or casual, nonoffensive touching, unaccompanied by other direct or circumstantial evidence of an intent to arouse, appeal to or gratify lust, passion, or sexual desire of the defendant or the child, will not qualify as a “lewd or lascivious act” for purposes of section 288. Distinguishing the former touchings from the latter is, however, ordinarily a question of fact for the jury to decide on the basis of the evidence presented in each case.
 
 (People
 
 v.
 
 Hobbs, supra,
 
 109 Cal.App.2d at p. 192 [each case involving a lustful advance upon a child must be decided by the evidence introduced and is not necessarily controlled by a previous decision].) Trial judges must be especially sensitive and alert to this issue and, in appropriate cases, grant motions for a judgment of acquittal (§ 1118.1) at the conclusion of the prosecution’s case-in-chief to assure that an innocent touching is not made criminal. Additionally, in close cases, appropriate lesser offense instruction under sections 647.6 (misdemeanor child molesting)
 
 [13]
 
 and 664 (attempts) must be given.
 

 In this case, the jury must have found that appellant’s touching of Joann’s hair and back were sexual in nature. We will not disturb this finding, which is supported by substantial evidence.
 

 2.-4.
 
 *
 

 H.
 
 This Matter Must Be Remanded for
 
 Resentencing.
 
 *
 

 
 *1796
 
 IV. Conclusion
 

 For all the foregoing reasons, the judgment of conviction is affirmed in its entirety, and the petition for writ of habeas corpus is denied. The cause is remanded for resentencing in accordance with the views expressed in this opinion.
 
 [16]
 

 Kline, P. J., and Smith, J., concurred.
 

 Appellant’s petition for review by the Supreme Court was denied November 30, 1994, and appellant’s petition for review by the Supreme Court was denied February 16, 1995. Mosk, J., was of the opinion that the petition should be granted.
 

 [1]
 

 Unless otherwise indicated, all further statutory references are to the Penal Code.
 

 [2]
 

 To indicate how appellant “dangled with” her hair, Joann demonstrated by “twirling [her] index finger right at the back of [her] neck.”
 

 [3]
 

 In this respect,
 
 Herbert
 
 is closely analogous to
 
 Coy
 
 v.
 
 Iowa
 
 (1988) 487 U.S. 1012 [101 L.Ed.2d 857, 108 S.Ct. 2798], In
 
 Coy,
 
 an Iowa trial court had invoked a statutory procedure to allow two 13-year-old girls to testify from behind a large screen about an incident in which the defendant stole into their tent as they were camping in the back yard of the house next door to his, shined a flashlight in their faces and sexually assaulted them.
 
 {Id.
 
 at pp. 1014-1015 [101 L.Ed.2d at pp. 862-863].) Taking a very literal, absolutist view of the confrontation clause guarantee, a five-justice majority of the Supreme Court held that the procedure deprived the defendant of his right to confront the witnesses against him.
 
 {Id.
 
 at pp. 1020-1021 [101 L.Ed.2d at pp. 866-867].) However,
 
 Coy
 
 was called into question just two years after it was decided when a different five-justice majority decided
 
 Maryland
 
 v.
 
 Craig
 
 (1990) 497 U.S. 836 [111 L.Ed.2d 666, 110 S.Ct. 3157], and approved a statutory procedure—televised testimony by an accusing witness who never had to appear in the courtroom—that arguably interfered more severely with the defendant’s right to face-to-face confrontation.
 
 {Id.
 
 at pp. 849-850 [111 L.Ed.2d at pp. 680-681].)
 

 [4]
 

 Maryland,
 
 v.
 
 Craig, supra,
 
 seems to require a trial court finding that a procedure affording less than literal face-to-face confrontation is necessary to protect the particular child witness. (497 U.S. at p. 855 [111 L.Ed.2d at pp. 684-685].) Appellant did not request and the trial court did not provide such a finding. However, any error on this point was harmless because the record of Tammy’s testimony amply supports an implied finding of necessity for the limited intrusion on appellant’s confrontation rights.
 

 [5]
 

 In her closing argument, the prosecutor further described Tammy’s condition while testifying: “And every time I asked Tammy a question, she looked over there, she looked at
 
 *1784
 
 you, and then she looked at me. And she had difficulty answering. Every time a question was asked, she looked over there, and then she looked back. You could see the terror in her eyes. You could see the fear. And she had to take a break.”
 

 *
 

 See footnote,
 
 ante,
 
 page 1772.
 

 [6]
 

 In his original
 
 Marsden
 
 motion, appellant raised a number of additional grounds for finding his trial counsel incompetent, including: failure to “impeach” Tammy with inconsistencies in her trial testimony; entry into an “illegal plea agreement” with the trial court; exclusion of appellant from side-bar conferences; and failure to move for exclusion of appellant’s prior conviction for impeachment purposes. Appellant did not press any of these claims during the
 
 Marsden
 
 hearing. Nor has his appellate/habeas counsel developed any factual or legal support for the additional grounds. We, thus, deem all but the Helmick and suppression issues abandoned. (See
 
 People
 
 v.
 
 Stewart, supra,
 
 171 Cal.App.3d at p. 393, fn. 1.)
 

 *
 

 See footnote,
 
 ante,
 
 page 1772.
 

 [7]
 

 Appellant also challenges the jury instruction used in this case to define such an act for purposes of section 288, subdivision (a). (CALJIC No. 10.41 (5th ed. 1988).) This instruction states that “[a] lewd or lascivious act is defined as
 
 any touching
 
 of the body of a person under the age of fourteen years with the specific intent to arouse, appeal to, or gratify the sexual desires of either party.”
 
 (Ibid.,
 
 italics added.)
 

 [8]
 

 Beginning with
 
 People
 
 v.
 
 Wallace, supra,
 
 11 Cal.App.4th at page 579, this line of cases has raised doubts about the definition of a “lewd or lascivious act” contained in CALJIC No. 10.41 (see
 
 ante,
 
 fn. 7), the essence of which has been approved for use for nearly a quarter of a century. (See
 
 People
 
 v.
 
 Dontanville
 
 (1970) 10 Cal.App.3d 783, 796 [89 Cal.Rptr. 172];
 
 People
 
 v.
 
 Austin
 
 (1980) 111 Cal.App.3d 110, 113 [168 Cal.Rptr. 401];
 
 People
 
 v.
 
 Pitts
 
 (1990) 223 Cal.App.3d 606, 887 [273 Cal.Rptr. 757].) In response, the Committee on Standard Jury Instructions adopted the alternative definition proposed in
 
 Wallace
 
 which, the committee suggests, may be used if the trial court so chooses. (Use Note to CALJIC No. 10.41 (1993 rev.) (5th ed. 1994 pocket pt.).) The instruction as revised provides that “A lewd or lascivious act is defined as any touching of the body of a person under the age of fourteen years . . . which to an objectively reasonable person is sexually indecent or tends to arouse sexual desire.” (CALJIC No. 10.41 (1993 rev.) (5th ed. 1994 pocket pt.), internal brackets omitted.)
 

 [9]
 

 Plainly, the statute itself is not so limited.
 
 (People
 
 v.
 
 Marquez, supra,
 
 28 Cal.App.4th 1315 at p. 1326.)
 

 [10]
 

 The defendant’s criminal history included six prior convictions for oral copulation and kidnapping.
 
 (People
 
 v.
 
 Gaglione, supra,
 
 26 Cal.App.4th atp. 1296, fn. 1.)
 

 [11]
 

 There are, of course, many possible variations on this scenario. The defendant’s efforts to draw the child into his or her confidence may be extended (see
 
 People
 
 v.
 
 Webb, supra,
 
 158 Cal.App.2d at p. 539 [befriending the child over a period of months]), or quite brief (see
 
 People
 
 v.
 
 Gaglione, supra,
 
 26 Cal.App.4th at p. 1295 [offer by stranger to pay child for helping with a simple task]). If the child balks at attempts to lull her or him into a false sense of security, the molester may resort to the use of force to accomplish the sexual objective. (See
 
 People
 
 v.
 
 Austin, supra,
 
 111 Cal.App.3d at pp. 112-114.) The surreptitious conduct may consist of exhortations by the defendant “not to tell,” or efforts to avoid detection. (See
 
 People
 
 v.
 
 Webb, supra,
 
 at p. 539 [separating a child from his or her companions];
 
 People
 
 v.
 
 Gaglione, supra,
 
 at p. 1295 [taking child into utility closet and closing the door].) The fact that the defendant is a stranger to the child or to the community may also be significant. (See
 
 People
 
 v.
 
 Gaglione, supra,
 
 at p. 1295 [stranger posing as a meter reader].) Further, a fearful reaction by the victim may be sufficient, but is not necessary, to indicate that social harm has been inflicted by the defendant. (See
 
 ibid,
 
 [child did not seem disturbed after being directed to touch, and touching, defendant’s genital area].) Finally, it is well established that it is not necessary to show that either the child or the defendant was actually aroused by the interaction. (See
 
 ibid,
 
 [neither child nor defendant seemed flustered, surprised, or disturbed by transaction in which defendant directed child to touch his genital area];
 
 People
 
 v.
 
 McCurdy
 
 (1923) 60 Cal.App. 499, 503 [213 P. 59].)
 

 [12]
 

 We do not quarrel with the alternative definition in CALJIC No. 10.41 (July 1994 rev.) that a lewd or lascivious act under section 288 is “any touching . . . which to an objectively reasonable person is sexually indecent or tends to arouse sexual desire.” (Internal brackets omitted.) That formulation does permit the jury to consider the totality of circumstances in assessing the lewd nature of the act. As we have discussed, where we part company with
 
 Wallace
 
 is in its conclusion that, as the Comment to the revised CALJIC No. 10.41 notes, “the act be
 
 by itself
 
 lewd.” (Italics added.) We agree with the
 
 Marquez
 
 court that “section 288, subdivision (a) does not require the touching to be overtly sexual in itself.”
 
 (People
 
 v.
 
 Marquez, supra,
 
 28 Cal.App.4th at p. 1326.) We do, however, believe the instruction could be improved by including the phrase “under the totality of the circumstances in which it occurred.”
 

 [13]
 

 The court gave an instruction based on section 647.6 in this case. (CALJIC No. 16.440 (5th ed. 1989 re-rev.).) Under this section, “the annoying or molesting act need not, in and of itself, be lewd . . . .”
 
 {People
 
 v.
 
 Thompson
 
 (1988) 206 Cal.App.3d 459, 463-466 [253 Cal.Rptr. 564] [repeated staring and gesturing sufficient].)
 

 *
 

 See footnote,
 
 ante,
 
 page 1772.
 

 [16]
 

 The trial court should also address a discrepancy between its sentencing order and the abstract of judgment. Although it does not affect the sentence imposed, the conviction on count 39 (§ 459) does not appear on the abstract of judgment.